Matthew Kiedah, Defendant and Appellant First, I'd like to thank the Court for indulging us with the opportunity to file extended briefs on both sides. As you are aware, this case involved a 20-day trial, tens of thousands of pages of documents, and lots of issues on appeal. We would have been disappointed given the number of evidentiary objections if you didn't file additional papers. This case, notwithstanding all the legal authorities that were cited by both sides, appears to have highlighted that this Court has not spoken on one particular issue. And that is, if a party commissions a study, a corporation, and the senior management of that corporation relies on its results and they make business decisions in accordance with those results, but they later realize that that study doesn't really help them in a lawsuit that they want to file against a competitor, and they attempt to then exclude the results on the basis that it's not reliable, what does the opponent have to do to have the study admitted? There is a lot of law on what you need to do to get your own studies in, and there's a lot of law on what you need to do to keep somebody else's studies out. But when your opponent has a study that it is trying to keep out, what do we do? But, counsel, I know this goes to the heart of what you're talking about here. You've got generally accepted principles. Let's just take a hypothetical. You've got company A, and they come up. They say, okay, we want to have this result. So let's concoct a study. It doesn't comply with any of the principles. Let's use it in some of our advertising. Let's use it in something. But it doesn't comply. Then you get into litigation, and you have the same situation as you have here. The company B wants to use the study that didn't comply in its, if you will, rebuttal. You still get down to the basic problem that in a court, you've got to have, if you're going to use a study, it's got to meet the generally accepted principles. I think that's your argument, is it not? You're saying that even though it may not have complied with generally accepted principles, they used it. We ought to be able to respond. That is correct, Your Honor. And I think this court's precedent in Southland-Sod and in Delbert II suggested, if not because it was the direct holding of the case, suggested that if a survey is prepared in advance of litigation and a party relies on it, that provides it with the indicia not only of authenticity but of reliability that would allow it to go before the jury. It's no longer just taking a bunch of numbers and sending it back to the jury room. It's essentially saying the reason you're seeing this is because that particular party thought it was important, not necessarily even for the truth of the matter asserted, although it could be. The point being, if they are arguing, as is in this case, that Bang health drink use of supercreatine has caused us $270 million worth of damages, and yet you've commissioned a study that says only 3% of people purchase Bang Energy for that reason, and you design your products such that are consistent with that study, shouldn't the jury be able to know that you had that information? And when they go to answer the jury interrogatory about they're instructed as the definitions of material and how damages must flow from material misrepresentations, why shouldn't the jury be allowed to see the very information? Does it matter whether the company knows that the, in this case, 3% was false or true? Does it matter whether it can be admitted later on? Your Honor, yes, and I'll give you a specific example why. During trial, Monster's vice president for the Americas gave testimony, and at the time that she wrote a sworn declaration saying that Monster was putting all of its interest towards creatine, the only information that they had at that time was the survey they commissioned saying that creatine was not important, and when we attempted to cross-examine the senior vice president for the Americas as to whether she was telling the truth under oath, we were told that we could not even refer to that study because the underlying data for whoever compiled it hadn't, that information didn't show that it was an accurate study. Right, but the court gave you the opportunity, even a continuance to depose someone who composed, worked on that study to testify, to authenticate it, you say, to show it complied with generally accepted survey principles, and you didn't do it. You're correct, Your Honor. And why is that? Well, I think, if I may be so bold, the better question here is not why didn't they do that, but why should they have to? Why should me, why should I, who has to get their information in that we know they relied on, why do I have to do their homework and show why it's reliable? Why isn't it sufficient for me to say, but they relied on it? So you want it to be self-authenticating because it was done by the other side. With a limiting instruction, if necessary, saying that this information is admitted for purposes of seeing what they made their decision on, not for the truth of whether 3% of users have creatine. You didn't even want to get the survey in. You wanted to get in just the PowerPoint summary of the survey, right? Yes, Your Honor, and it goes to my next point. The InfoScout survey, which is what we've been talking about throughout, is a 19-page document. What we were trying to get into evidence through Scott DeLorme, through Emily Teer, were not just the survey documents. It was the documents that they created from the survey. They took the survey information from InfoScout and created their own PowerPoints and wrote their own reports and made their own recommendations and sent emails guiding strategy for the company. And yet when it came time for us to cross-examine them, we couldn't even mention the InfoScout survey, much less get the documents that they created into evidence. But counsel, I guess I'm saying what Judge Gilman is talking about is what has troubled me. District judges do things differently, but my reading of the record here is that the judge really gave you, said, Well, look, you want to do discovery, you want to do more, you want to get whatever you need to to get what you want in good, but you can't use the survey because it doesn't comply. There are lots of ways to skin a cat, and it seems like that even though the court said you can do it this way, you said I don't want to do it, I want to do it my way, and the court said no. Well, I think the timing of how these arguments were presented is also important here. The parties filed, Monster filed its motion in limine in January of 2022, and the response came in right afterwards. And the motion that Monster filed said that they wanted to keep out any argument and any evidence and any reference to this survey whatsoever. And a response came back citing Southland-Sod, citing Divert 2, saying that's not the law, you can't do that. And the trial court sort of agreed with us, but it didn't do so until August 2nd in a case that was set for trial on September 6th when discovery was closed. Did our trial counsel make a gamble that that wouldn't be necessary because of this court's statement in Southland-Sod or this court's statement in Divert 2? Perhaps. But then look at the ruling itself. What did the court say? It said when it issued its written ruling that if an expert were able to prove it up, then that information could come in. It certainly never said that you cannot even use it to impeach a witness who denies its existence or says something that's materially adverse to what a declaration says. Well, but the court allowed your experts to say that they relied in part on the information in that survey, about only 3% relied, the customers relied on supercreatine. Agreed, Your Honor. And although we could say that part of this case is a battle of the experts, do you believe that people want 3% or do you believe their survey expert who said it was 64%? But it's more than just that. If their vice president for the Americas testifies this was our goal and the only information that she would have had says something completely the opposite and she's made a statement under oath, why am I not allowed to use the evidence that they gave us to impeach her and say don't believe what she's saying? To suggest that because somewhere down the line in a trial that lasted 20 court days that over the course of a month that hearing one person say, oh, yes, a 3% number or even two people say that over the course of a month as opposed to having an exhibit, being able to discuss it in closing arguments, which was prohibited here, or being able to cross-examine somebody with the, if you will, are you lying then or are you lying now, that's an essential part of a defense and we're talking about $270 million against an individual. Counsel, let me ask you this. I understand you're upset about this, but we're talking about abuse of discretion involving an evidentiary issue. We've talked about the fact that the court allowed your experts to refer to this 3%, to refer to the survey, so all of the data, if you will, that would stand out were testified about. You just wanted a chart. Now, I understand that. I get that as a trial preparation presenting it to the jury, but on an abuse of discretion standard, how do we reverse that? There are two answers, Your Honor. You can take your time and do it afterwards if you want. I was going to ask for three minutes for rebuttal. May I still reserve that? You're almost down there, but yeah, whatever you want. Thank you. Two things. First is, in our brief, we noted that the standard of review here, if this court were to conclude that the trial court's ruling effectively prohibited the office from asserting a defense, whether it's an affirmative defense like unclean hands or actually defending the argument that this was not a material misrepresentation, that this court should review it de novo, not for abuse of discretion. You're saying that even though the experts did testify about the 3%, your experts did, in other words, the evidence that you wanted to get in in the form of a chart came in in a different way, and you're saying that it would change this from an abuse of discretion to a different standard? If I may really quickly, two things. It's not just the chart. It's the e-mails and the annotations and the presentations that they put together from the chart that they received from InfoScout. So to answer your question, should this court look at it for an abuse of discretion if he suggests that you can't use this information to impeach one of the highest people in their country in what appears to be a clear lie? But you could do that, though, through your experts. I mean, you could say something about the 3%. You had the opportunity to do that. Our expert was able to say that Monster-sponsored research at some time with an unnamed author suggested 3% was the goal. That is not nearly as powerful as being able to show a document that somebody else, that the witness on the stand emailed to another person that says exactly the opposite. Excuse me, please. If I could preserve the balance of my time. Please do. Thank you. Please do. Very well. All right. Let's hear now from, is it Lieben? It's Lebeau. Oh, I'm sorry. It's a hard one, Your Honor. A French one, right? It is a French one, Your Honor. Okay, sorry about that. No problem. Allison Lebeau from Houston-Hennigan on behalf of Monster Energy Company. So I'll start off where my colleague opposing counsel just left off, is that this is an evidentiary ruling and it's reviewed for abuse of discretion. That's the standard. They, of course, would like it to change. What's your best argument that there is nothing in this case that warrants a change in our standard of review? Well, nothing warrants a change for the reasons Your Honor hinted at, is that this isn't clearly a case in which the case they cited, where an affirmative defense was struck in its entirety self-defense because it wasn't self-defense as a matter of law. Here, they were allowed to talk about the InfoScout survey. They just weren't allowed to display it to the jury. This is a quintessential exclusion of particular evidence, which is always going to be used. May I ask you this? It's a big record, but in addition to the reference to the information in the study by the experts, what other information was allowed in? What was allowed for purposes of cross-examining Monster's witnesses? So this is noted by the court in its denying the new trial motion. They were allowed to ask our experts about InfoScout to try to lay the foundation. The court gave them that opportunity. They asked Monster witnesses, basically almost all of them that got on the stand, if they knew anything about it, and none of them did, and that's the court cited that in denying the new trial motion, and that's in the first volume of the supplemental record at page 10. So they did try to lay the foundation with Monster folks and just weren't able to do it because it is not a Monster-commissioned study. This was a study done by a third party, and as Your Honors aptly noted, they were given the opportunity to take discovery against this third party. Indeed, in part of our motion to compel was based on the fact that no one could lay the groundwork for these generally accepted principles, that defendants themselves admitted that. They filed a motion to compel long before trial where they said, and I'm quoting, VPX cannot reasonably analyze any of the final InfoScout reports InfoScout has produced without the appropriate context provided by the actual data underlying their findings, documents reflecting how the survey design iterated over time before it became final, and communications regarding why a particular survey's design was changed. That's in volume four of the record at 606 to 607. After that, defendants actually went out and got an order allowing them to take the deposition of InfoScout to get this information. For some reason, they declined not to do that. And InfoScout's the third party, right? The third party. And by the way, they got that order allowing them to take the deposition in June 15th of 2021, more than a year before trial. So my opposing counsel said something about you have to consider the timing. The timing shows there was plenty of time for them to take this and get this discovery if they wanted. They just declined to do it. And if they had taken the deposition of the third party who prepared it, I assume they could ask pretty much whatever they wanted about how the report was prepared and its conclusions and so on, right? Exactly right. And as the judge found in his motion in limine order, he rejected our arguments on reliability of the survey and focused only on foundational issues about generally accepted principles. So had they been taking the deposition and presumably been able to lay the foundation, there's no question it would have come in. And it's not an abuse of its discretion for the judge to have determined that because they didn't do those things and satisfy the foundation requirements that this court has set forth, that it does not come in. Even then, as Your Honors noted, they were given wide latitude to have their experts talk about this at trial. Among other things, their survey expert testified that he reserved consumer research produced by Monster in this case. He testified that survey was not done for litigation, which he considered important because it wasn't tainted by litigation bias. That's at volume four of the supplemental record at 850. He then testified that he did his own survey. That survey came in and that the results of his survey, 3% of people thinking supercreatine was important, was corroborated by the Monster Commission survey. He even put up a demonstrative slide that said, quote, Monster Commission research showed supercreatine and creatine are immaterial. So from your perspective, the trial judge believed that the plaintiffs in this case had plenty of opportunity to present this issue through experts, through cross-examination, through discovery, et cetera, et cetera. And if they didn't do it, that's their problem. That's exactly right. And the only thing they weren't allowed to do was put up the InfoScout slides themselves. The judge's motion eliminating order said rightfully, you can use this with experts to talk about their opinions. What you can't do is introduce it as standalone evidence because you haven't laid the proper foundation. And that ruling is not only not of use of discretion, but in fact, correct. And I want to go back a little bit to we talked a little bit about the standard, the generally accepted survey principle standard. In the appellant's brief, they talk about how the court applied the wrong standard. I just want to make clear that the court, in fact, actually applied the standard that we have been discussing. It, in fact, quoted this court's decision in E&J Gallo Winery. That's the same standard that we've been discussing. It's the same standard that the opposing counsel put in his brief. It's even the same case that was cited. So there's no merit to the court that the standard that the district judge applied was incorrect. It was the right standard. Let me ask you this, by the way. You have to prove your client, Monster, had to prove that the supercreatine was false advertising and it was material to a consumer. Exactly. If you can't prove materiality, you don't satisfy all the conditions. And you agree with that principle, right? I agree with that. Well, why? What has Monster, what proof is there that supercreatine was material to a consumer of Bang? It's a great question. There's overwhelming evidence of that. The juries heard Mr. Owock's own testimony on the stand where he acknowledged writing, our patented water-stable supercreatine is what separated Bang from every other energy drink on the market. That's at the volume three of the supplemental record at 577. That's Mr. Owock's testimony. The Instagram post that is also in the record in which Mr. Owock wrote that, that's volume two of the supplemental record at 273. The VPX's executive vice president of sales also testified on this issue. He said supercreatine was Bang's most important distinguishing feature for purposes of sales. And both Mr. Owock and Mr. Bokovi, who was the vice president, testified that VPX and Bang was the first drink ever with water-stable creatine. That's at three supplemental record, 517 and 512. And I got it. The proof showed what? It really had no supercreatine in it? That's exactly right. There was no creatine in the product at all. And that's what we were able to prove at trial. Also, we were able to prove that it was material because the Bang can, and we have photos of those in the record, at volume two of the supplemental record, 253, the Bang can says supercreatine on the front of it. Very top. Very top. And then there were posts where Mr. Owock called supercreatine arguably the greatest innovation in the history of sports nutrition and beverages. That's at volume one of the supplemental record of 133. So with all of this overwhelming evidence, that's even before you get to the surveys showing that. We had a survey conducted by an individual. He used to be the chief statistician for the census. And he conducted a survey showing that supercreatine mattered. But Mr. Owock and VPX's own statements about how important supercreatine was to consumers and to the sales of Bang, this was overwhelming evidence of its materiality, and the jury just didn't believe Mr. Owock's statements at trial that no one buys Bang because of supercreatine. It's interesting that the Info Sports Search showed the same thing. I mean, only 3% thought it was material. Or at least that was the most important factor. That's right. And the most important factor in that one, obviously the reliability wasn't the reason the survey didn't come in, but I will note that the survey surveyed women, and creatine and supercreatine are actually important to men, women. It's a gendered issue on that in particular. But that wasn't the reason it didn't come in. But our experts did a survey that surveyed both genders and found that supercreatine was material to folks, not everyone, but to a significant number of consumers. And then our damages expert quantified both how effective that was in boosting Bang's sales and how much it hurt Monster's sales because Bang took sales that would have otherwise gone to Monster. And with all of that information in, the jury just believed Monster's theory of the case and not Mr. Owag's. $270 million is a pretty hefty judgment, but I gather that Owag is not contesting the amount of the judgment. That's not one of the issues on appeal. That is not one of the issues on appeal. And we did have a damages expert who put forth and went through loads of testimony on how those numbers were calculated. And it started with the effect on sales, and it was reduced by the amount of consumers that actually care about supercreatine versus those that don't. How many sales did that take away from Monster as opposed to Red Bull or other energy drinks? So there was a significant analysis that went into that, and the jury adopted our expert's number and believed his analysis to be thoughtful and credible. Can I go back just for a second to the survey? I gather your position is even if the charge had gone in, it would have gone to weight, nothing else. You had overwhelming evidence that showed what Owag claimed, et cetera, et cetera, and it wouldn't have made any difference anyway. That's exactly right. There's no harm because of the overwhelming evidence that supercreatine mattered to folks. In addition, Mr. Owag's experts were allowed to testify on materiality issues. I've talked about that a little bit before. But Mr. Owag's own, on cross, Mr. Owag's own damages expert admitted that a survey that he adopted and relied on in his report showed that up to 21 percent of people actually cared about creatine. So that was another thing on the side of the scale, that the InfoScout survey wouldn't have mattered because they heard about it, they knew the 3 percent number, they knew that his experts claimed that that number was corroborating their results. But again, damages expert admitted that he actually relied on a different survey that found a much, much, much higher percentage. And so Mr. Owag's survey experts said that it had no creatine, and Mr. Owag, it had no impact, and Mr. Owag himself said it had no impact. But it just didn't matter for purposes of those, the jury's findings. I mean, it sounds like your client, according to the defense theory, used that survey, the InfoScout, to develop its own competing drink, what, rain? Yeah, that's not actually true, and they cite nothing in the record for that. In fact, the only thing in the record is when they were asked about this survey, they didn't recall it. And that's, again, at one supplemental record, page 10. So when they were asked about this survey, that, of course, was Mr. Owag's theory, and his theory was that Monster created rain, and created rain to copy Bang, and didn't put supercreatine in it because people didn't care about it. But that's not what the jury believed. They were allowed to ask lots of questions from our witnesses about why there wasn't supercreatine in rain. And the testimony was that Monster, in fact, wanted to put creatine in rain, but it just wasn't shelf-stable. And, of course, this was the problem Mr. Owag claimed to have fixed. All of his social media posts said they've made the first water-stable creatine and been able to put it in a drink. So Monster's witnesses testified the reason rain didn't have creatine is because creatine's not water-stable, and you couldn't put it in a drink. So the theory that they wanted to put in and sell the jury that, no, no, that Monster realized it wasn't important, was just debunked by Monster's witnesses. In fact, Monster's CEO testified that 7-Eleven came to Monster and said, we'd love you to make a drink with creatine. Can we get on that? And Monster said, this is a great opportunity for us. We're trying to see if it can work. We tried it before, but, no, it's just not water-stable. And so we can't do that. And they wouldn't do it. And that's why they didn't have creatine in rain. And at the end of the day, that's the reason why Monster knew that Mr. O'Rourke wasn't telling the truth about supercreatine, is that they knew that this was impossible, and that Mr. O'Rourke's claim to have done something revolutionary in the market was just a scam and wasn't true. And that's the evidence the jury heard, and that's the evidence the jury believed, and that's how you ended up with the result that we got in this case. Okay. Your time is up. Other questions by counsel? Very well. Thank you, counsel. Thank you very much, Your Honors. Okay. We have some rebuttal time, counsel. May it please the Court. I already talked fast to begin with, so I'll do my best to be comprehensible. Assuming without conceding that the standard is abuse of discretion, that standard is obviously not unfettered discretion. At some point in time, a decision has to be so contrary to guiding rules or principles that we say it was, in fact, abused and did, in fact, cause harm. But, again, you're obviously a very smart, capable lawyer. You all disagree on the facts, but the reality is that there was a huge amount of evidence that came in on the other side. You're talking about a relatively small piece of a third-party-produced survey. Do you want the Court to believe that under an abuse of discretion standard that we would reverse a 20-day trial because the materiality of this is so great that it cries out for relief? The answer is yes, but for a reason different than what you just said. My friend on the other side pointed out extensive parts in the record where Mr. Olock made claims about his own product. Obviously, they disagree. But the question for the jury wasn't whether Jack Olock believes his product is effective. The question is whether Monster does. And if there are documents that show that Monster believed that nobody cared about supercreatine, it was essentially a meaningless label, and that everybody was buying it because it had no calories and no sugar and no carbohydrates, then documents that show Monster didn't care about this is just as important as all of the other information that Monster wants to sell to us. So where I'm going with – Even though – forgive me – even though evidence of that third-party 3% issue did come before the jury through experts, through other testimony, you're saying, if I understand you correctly, that it's the fact that the chart itself was not there is what turns this case over. Not the chart itself, Your Honor. I'll go back to the example of when the Vice President for the Americas was testifying. They were trying to use her words against her. If we had an opportunity – okay, this is the record. She's asked questions in cross-examination. We seek to introduce an exhibit that shows that she's not telling the truth. The judge has to make a decision on admissibility. I see my time's up. May I finish my answer? Just answer the question. The judge has to make a decision on admissibility. What guiding rule or principle was in front of him at that time that said, under no circumstances can this study commit? And we respectfully submit that there was not one. Alternatively, that Self and Saad already said that a third-party survey that's commissioned in advance of litigation should be admitted without the proffering party having to prove up the science behind it. Other questions by my colleagues? Thanks to both counsel. We appreciate it very much. The case just argued is submitted.
judges: Gilman, SMITH, VANDYKE